UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| T.L.,<br><br>    Plaintiff,<br><br>    v.<br><br>KILOLO KIJAKAZI,<br><br>    Defendant. | Case No. 22-cv-03046-JCS<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS**<br><br>Re: Dkt. Nos. 11, 14 |

## I.    INTRODUCTION

On September 17, 2019, T.L.[1] applied for disability under Title II of the Social Security Act alleging disability beginning January 20, 2016.  The claim was denied initially and upon reconsideration, and Serena S. Hong, an administrative law judge ("ALJ"), held a hearing on February 23, 2021.  On May 3, 2021, the ALJ denied Plaintiff's application and on March 28, 2022, the Appeals Council denied Plaintiff's appeal of the ALJ's decision, making it the final decision of Defendant Commissioner of the Social Security Administration ("Commissioner").  After the Appeals Council denied review, Plaintiff sought review in this Court pursuant to 42 U.S.C. § 405(g).  Presently before the Court are the parties' cross-motions for summary judgment.  For the reasons stated below, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment and remands for further proceedings consistent with this opinion.[2]

---

[1] Because opinions by the Court are more widely available than other filings and this Order contains potentially sensitive medical information, this Order refers to Plaintiff using only his initials.

[2] The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C.

## II. FIVE-STEP FRAMEWORK FOR DETERMINING DISABILITY

Disability insurance benefits are available under the Social Security Act (the "Act") when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if their physical or mental impairments are of such severity that they are not only unable to do their previous work but also "cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act. *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Id.* "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Id.*

At step one, the ALJ considers whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in such activity, the ALJ determines that the claimant is not disabled, and the evaluation process stops. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ continues to step two. *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment" or combination of such impairments that meets the regulations' twelve-month durational requirement. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ determines that one or more impairments are severe, the ALJ proceeds to the next step. *See id.*

---

§ 636(c).

At step three, the ALJ compares the medical severity of the claimant's impairments to a list of impairments that the Commissioner has determined are disabling ("Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If one or a combination of the claimant's impairments meets or equals the severity of a listed impairment, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis continues. *See id.*

At step four, the ALJ must assess the claimant's residual functional capacity ("RFC") and past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The RFC is "the most [a claimant] can still do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's] case record." 20 C.F.R. § 404.1545(a)(1). The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform their past relevant work. 20 C.F.R. § 404.1520(a)(4). Past relevant work is "work that [a claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." 20 C.F.R. § 404.1560(b)(1). If the claimant is able to perform their past relevant work, then the ALJ finds that they are not disabled. If the claimant is unable to perform their past relevant work, then the ALJ proceeds to step five.

At step five, the Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite [the claimant's] identified limitations." *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). If the Commissioner meets this burden, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(f). Conversely, the claimant is disabled and entitled to benefits if there are not a significant number of jobs available in the national economy that the claimant can perform. *Id.*

## III.   FACTUAL BACKGROUND

### A. Education and Work History

T.L. was born in January 1971 and was just short of 45 years old as of January 20, 2016, his alleged disability onset date. Admin. Record ("AR," dkt. 10) at 170. He completed some high school education in Vietnam[3] and then took English classes in the United States. AR 36. At the

---

[3] T.L. testified at the administrative hearing that he had completed tenth grade, AR 36, but a Disability Report in the record reflects that T.L. completed twelfth grade. AR 233.

3

time of the hearing, T.L. lived in San Rafael with his wife, minor daughter, and parents. AR 36, 251. A work history report submitted to the Social Security Administration reflects that T.L. worked 40 hours a week as a school district cook between 1991 to 2017. AR 238-239. T.L. also testified at the administrative hearing that he had worked other jobs as well, including as an assembly line worker and a substitute janitor in another school district. AR 37-43. After sustaining a back injury in January 2016, T.L. was put on a modified duty. AR486-487. By 2017 he had stopped working. AR 198. In July 2019 he had a heart attack and had a stent placed. AR 377-378.

### B. The ALJ's Decision

At step one, the ALJ concluded that T.L. had not engaged in any substantial gainful activity since January 20, 2016. AR 15. At step two, she determined that T.L.'s degenerative disc disease, left rotator cuff tendinitis syndrome, and coronary artery disease (post stent placement) constituted severe impairments that "significantly limit the ability to perform basic work activities." AR 16.

At step three, the ALJ considered T.L.'s medically determinable physical impairments, singly and in combination, and found that they did "not meet or medically equal the severity requirements of any listed impairment." AR 16. The ALJ specifically considered Listings 1.15 (disorders of the skeletal spine affecting nerve root(s)), 1.16 (lumbar spinal stenosis), 1.18 (abnormality of major joints in any extremity), 4.02 (chronic heart failure), and 4.04 (ischemic heart disease) in making this determination. AR 16. The ALJ also considered obesity, even though it is not an official listing, and found it to be a nonfactor. AR 16.

At step four the ALJ found that T.L. had the residual functional capacity ("RFC") to perform:

> light work as defined in 20 CFR 404.1567(b) except the claimant can lift or carry up to 15 pounds occasionally; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but can never climb ladders, ropes, or scaffolds; can occasionally overhead reach; can frequently handle and finger; must avoid concentrated exposure to extreme cold and hazards such as unprotected heights.

AR 16.[4]  In reaching this RFC, the ALJ found that T.L.'s "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  AR 17.

At step five, the ALJ determined that T.L. could not perform his past relevant work as a cook, a machinist or a janitor with his current RFC.  AR 23-24.  Nevertheless, considering T.L.'s age, education, work experience, and RFC, and in reliance on the testimony of the vocational expert ("VE"), the ALJ concluded that T.L. could perform jobs as a Ticket Seller, Ticket Taker, and Sales Attendant.  AR 24–25.  Consequently, the ALJ concluded that T.L. was not disabled at step five.  AR 25.

## IV. ISSUES FOR REVIEW

T.L. seeks reversal of the Commissioner's denial of benefits on the following grounds:  (1) the ALJ erred by dismissing the opinions of treating physician Dr. Vu without properly considering the factors governing the consideration of medical opinions under 20 C.F.R. § 416.920c(c) and for reasons that were not supported by substantial evidence; (2) the ALJ did not offer specific, clear and convincing reasons supported by substantial evidence for discrediting T.L.'s symptom testimony; (3) the ALJ failed to properly consider headaches and cervical radiculopathy as severe impairments or factor them in to T.L.'s RFC; (4) the ALJ failed to account for T.L.'s change in age category by the time of the hearing, when he was 50 years old, putting him in the category of "person closely approaching advanced age"; and (5) the ALJ reached an

---

[4] 20 C.F.R. § 404.1567 provides:

> Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

5

1  RFC unsupported by substantial evidence.[5]

2  **V.   ANALYSIS**

3     **A.  Standard of Review**

4  District courts have jurisdiction to review the final decisions of the Commissioner and may affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).   When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner that are free of legal error and supported by "substantial evidence."  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based on the entire record.  *Richardson v. Perales*, 402 U.S. 389, 401. (1971).  " 'Substantial evidence' means more than a mere scintilla," *id*., but "less than preponderance."  *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (cleaned up).  Even if the Commissioner's findings are supported by substantial evidence, "the decision should be set aside if the proper legal standards were not applied in weighing the evidence and making the decision."  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (cleaned up).  In reviewing the record, the Court "must consider both the evidence that supports and the evidence that detracts" from the Commissioner's conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

   **B.  Whether the ALJ Erred in Rejecting Dr. Vu's Medical Opinions**

      **1.  Background**

Dr. Vu is a physical medicine and rehabilitation specialist at the main campus of the San Rafael Kaiser.  AR 412.  She began treating T.L. for lumbar radiculopathy on January 14, 2019. AR 412, 618.  In her treatment notes, Dr. Vu wrote that T.L. "present[ed] with more than 3 years of low back pain" and that T.L. reported he had been experiencing low back pain that radiated into

---

[5] The Court notes that neither party complied with its May 25, 2022 Order requiring them to file a joint or separate statements of the administrative record.  The Court adopted this requirement not only to assist it in evaluating the parties' arguments but, more importantly, to ensure that the parties conduct a fulsome review of the record in connection with their motions.  While the extensive factual background provided by Plaintiff in the body of his summary judgment motion reflects that Plaintiff's counsel has conducted such a review, it is not apparent that the Commissioner has done the same as the Commissioner's brief contained no statement of facts, instead citing to the ALJ's description of the record.  *See* Defendant's Motion at 1.

his left thigh and calf for two and a half years. AR 412 (1/14/19 treatment note). T.L. reported thigh and calf numbness in addition to one or two instances of leg buckling, but no falls. AR 412. T.L. told Dr. Vu he had tried physical therapy and acupuncture with no improvement since onset. AR 412. Dr Vu noted, "Worse with - sitting, standing, bending forward or back[;] Better with - walking and lying flat on back[.]" AR 412. Dr. Vu further noted that T.L.'s range of motion appeared "[l]imited and painful with flexion, extension and left lateral and flexion reproducing radiating pain." AR 413. Dr. Vu prescribed gabapentin and referred T.L. to radiology for an MRI of his spine. AR 413.

The MRI revealed multilevel disc desiccation, slight retrolisthesis at L4, marrow signal within normal limits, and normal soft tissue. AR 548–549. There was a mild disc bulge and mild bilateral face arthropathy at L2–L3 with no central canal stenosis or neuroforaminal narrowing; at L3–L4, a mild disc bulge and mild bilateral face arthropathy with no central canal stenosis, and with mild neuroforaminal narrowing bilaterally. AR 549. At L4–L5, the MRI showed a large disc bulge with moderate bilateral facet arthropathy and marked ligamentum flavum thickening accompanied by moderate central canal stenosis and moderate neural foraminal narrowing bilaterally. AR 549. Additionally, T.L. had a small disc bulge at L5–S1, exhibiting moderate bilateral facet arthropathy, with no central canal stenosis, and with moderate neural foraminal narrowing bilaterally. AR 549.

Dr. Vu called T.L. and explained the results of the MRI to him, diagnosing T.L. with "lumbar disc herniation w[ith] radiculopathy." AR 409 (1/17/19 treatment note). T.L. told Dr. Vu that the radiculopathy was "much improved with gabapentin" but that the medication was causing him to feel lightheaded and so Dr. Vu reduced T.L.'s gabapentin dose from four capsules to three. AR at 409.

T.L. returned to Dr. Vu on February 5, 2019 with "worsening low back pain when weather is cold[.]" AR 408 (2/5/2019 treatment note). T.L. reported that the gabapentin was not helping with his back pain. He also reported that he still had leg pain but that his legs "[felt] much better[.]" AR 408. Dr. Vu prescribed 600mg Motrin, advised T.L. to increase his gabapentin dose and recommended physical therapy. AR 408, 618.

At T.L.'s February 5, 2019 appointment, he dropped off forms for Dr. Vu to complete in connection with his application for disability benefits. AR 407. On that same date, Dr. Vu completed a Spinal Impairment Questionnaire. AR 618-624. Under "Frequency of treatment" she wrote, "recommend once/week x 12 weeks [physical therapy]." AR 618. Dr. Vu listed T.L.'s diagnosis as lumbar radiculopathy, noting that she "[d]id not treat [T.L.] for cervical spine." AR 618. Dr. Vu listed T.L.'s prognosis as "Good." AR 618. Dr. Vu summarized T.L.'s symptoms as "3 years low back pain, 2.5 years low back pain radiating to left lateral thigh and posterolateral calf. Initially see[n] by another physician as an occupational injury, now retired from that job. Complaint of thigh and calf numbness." AR 620. Under "clinical findings" Dr. Vu noted a limited range of movement at the lumbar spine in "Flex/Ext/left lateral flexion." AR 618. She found that the lumbar spine exhibited no tenderness, no muscle spasms, no sensory loss, some reflex changes at T.L.'s right and left knees and ankles, but no muscle atrophy, abnormal gait, swelling, crepitus, or trigger points. AR 619. Dr. Vu found positive facet loading on T.L.'s left side. AR 619. Under "laboratory and diagnostic test results" that supported her diagnosis, Dr. Vu wrote, "Large L4–L5 disc bulge, ligamentum flavum hypertrophy, facet arthropathy with moderate neural foraminal narrowing." AR 620. She reported that T.L. suffered neuropathic pain in his "left lateral thigh and posterior, lateral calf and low back." AR 620.

Dr. Vu wrote that T.L. experienced this pain intermittently "with sitting, standing, bending forward and backward," and that T.L.'s pain symptoms improved "with walking and lying flat on [his] back." AR 620–621. In response to the question, "Have you been able to completely relieve the pain with medication without unacceptable side effects?" Dr. Vu checked "No." AR 621.

The questionnaire then asked Dr. Vu to evaluate T.L.'s residual functional capacity were he to be placed in a "normal competitive five day a week work environment on a sustained basis." AR 621 (emphasis removed). Dr. Vu opined that T.L. could sit two hours intermittently, stand two hours intermittently, and walk four hours. AR 621. She opined that it would be "necessary or medically recommended" for T.L. not to sit or stand continuously in a work setting, but he could walk. AR 621. Furthermore, if T.L. were to sit, Dr. Vu opined that he would need to get up and move around every fifteen minutes. AR 621. In response to the question "How long before your

patient can sit again?" Dr. Vu wrote "Depends on his [progress] he needs to demonstrate participation in physical therapy." AR 621. Dr. Vu opined that T.L. could lift up to ten pounds frequently, up to twenty pounds occasionally, but never more than twenty pounds. AR 621. In a handwritten note in the margin, Dr. Vu wrote that her estimate of never more than twenty pounds was "temporary." AR 621. Dr. Vu stated that T.L.'s gabapentin "uptitration dose" was 300 mg. but that no "stable dose" had been reached yet. AR 622. Dr. Vu checked "No" as to whether T.L.'s impairments were "ongoing, creating an expectation . . . that they will last at least twelve months"; and she checked "No" as to whether emotional factors contributed to the severity of T.L.'s symptoms and functional limitations. AR 622.

In response to the question, "Will your patient sometimes need to take unscheduled breaks to rest (e.g. shift positions to relieve pain, etc.) during an 8-hour working day?" Dr. Vu opined that T.L. would need to "change position every 15 min[utes]" to "ease pain." AR 623. In response to a question about T.L.'s ability to keep his neck in a constant position, Dr. Vu wrote, "Cannot say. I did not treat his neck." AR 623. Dr. Vu opined that T.L. would have "good days" and "bad days," and that T.L. would likely be absent from work about once a month because of his impairments. AR 623. In the "additional comments" section of the form, Dr. Vu wrote, "This is a combination of wear and tear . . . on the spine probably aggravated by lifting . . . boxes on the job. This is a chronic problem with occasional flares." AR 624. The record shows that Dr. Vu continued to treat T.L. for his back, and later his neck and shoulder, and prescribed injections to control his lower back pain when it had not improved by May 2019. AR 396–399, 400.

In her decision, the ALJ acknowledged Dr. Vu's role as a "treating source" but found her opinions about T.L.'s impairments "not persuasive" because "[t]he medical opinion is not supported by the examination of the claimant, references to specific findings, and well-supported explanations." AR 19, 21. She goes on to offer the following examples in support of this statement:

> For example, the claimant was evaluated for chest pain on September 2019 but the claimant's ECG on September 2019 showed a normal sinus rhythm with no acute changes (2F/27). On October 2019, at his cardiac rehabilitation consultation, the claimant reported swimming 3 to 4 times per week and walking daily, with only a little chest pain

> sometimes (2F/4). The claimant last felt chest pain on September 2019 but reported he was doing well on October 2019 (2F/4). At the claimant's internal medicine consultative exam on January 2020, the claimant was asymptomatic for chest pains and his cardiovascular exam was negative for congestive heart failure or arrhythmia (4F/5). On December 2020, the claimant had a stress test, which indicated 10.1 METs achieved (9F/8). His blood pressure response was normal, and the claimant's resting EKG was normal, and no chest pain or shortness of breath developed during the stress test. The claimant developed left leg pain and stopped the study (9F/8).

AR 22. The ALJ states further that Dr. Vu's opinions are "not consistent with evidence from other medical or nonmedical sources, such as the claimant's daily and walking swimming [sic], discussed above." AR 22.

### 2. Legal Standards

For claims filed before March 27, 2017, "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)). However, the regulations regarding the evaluation of medical evidence have been amended and several of the prior Social Security Rulings, including SSR 96-2p ("Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions"), have been rescinded for claims protectively filed after March 27, 2017, as is the case here. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c (a), 416.920c(a).

The new regulations provide that the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." 20 C.F.R. § 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following factors: 1) supportability; 2) consistency; 3) relationship with the claimant; 4) specialization; and 5) "other factors." 20 C.F.R. § 416.920c(a)-(c). "Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [they] considered the medical opinions' and 'how persuasive [they] find all of the

medical opinions.'" *Christopher Charles A. v. Comm'r of Soc. Sec.*, No. C19-5914-MLP, 2020 WL 916181, at *2 (W.D. Wash. Feb. 26, 2020) (citing 20 C.F.R. §§ 404.1520c(a) and (b) (1), 416.920c(a) and (b) (1)); *see also Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

As with all other determinations made by the ALJ, the ALJ's explanation must be supported by substantial evidence. *See Woods, 32 F.4th* at 787 (holding that, under the new regulations, "an ALJ's decision . . . must simply be supported by substantial evidence"); *Patricia F. v. Saul*, No. C19-5590-MAT, 2020 WL 1812233, at *4 (W.D. Wash. Apr. 9, 2020) (citing 82 Fed. Reg. at 5852) (finding that, under the new regulations, "[t]he Court must . . . continue to consider whether the ALJ's analysis has the support of substantial evidence"); *J.B. v. Kijakazi,* No. 20-cv-06231-VKD, 2022 WL 282513, at *3 (N.D. Cal. January 31, 2002).

The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that "form[ed] the foundation of the [prior] treating source rule." Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853. The ALJ is required to explicitly address supportability and consistency in their decision. 20 C.F.R. § 404.1520c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). With respect to "consistency," the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

Typically, the ALJ "may, but [is] not required to," explain how they considered the remaining three factors listed in the regulations. *Id.* However, where two or more distinct medical opinions are equally supported and considered, the ALJ is required to articulate how they considered factors other than supportability and consistency, including the treatment relationship. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3); *see also Woods*, 32 F.4th at 792; *Ceja v. Comm'r of Soc. Sec.*, No. 1:20-CV-01267-EPG, 2021 WL 4690742, at *1 (E.D. Cal. Oct. 7, 2021).

The third factor, relationship with the claimant, is split into five sub-factors. 20 C.F.R. §§ 404.1520c(c)(3), 416.927c(c)(3). When analyzing the relationship with the claimant, the adjudicator should consider: (1) the length of the treatment relationship; (2) the frequency of examinations; (3) the purpose of the treatment relationship; (4) the extent of the treatment relationship; and (5) whether there was an examining relationship. *Id.*

Specialization, the fourth factor, suggests that a medical opinion is more persuasive if the source is a specialist in an area relevant to the claimant's conditions. 20 C.F.R. §§ 404.1520c(c)(4), 416.927c(c)(4). Finally, the catch-all provision, "other factors," permits adjudicators to consider "other factors that tend to support or contradict" a medical opinion. 20 C.F.R. §§ 404.1520c(c)(5); 416.927c(c)(5) (including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements.").

### 3. Discussion

In determining the weight to give Dr. Vu's opinions, the ALJ was required to consider the factors discussed above, the most important of which are supportability and consistency with the record as a whole. Although the ALJ purported to conduct such an analysis, the reasons she offered for discrediting Dr. Vu's opinions are not supported by substantial evidence.

Rather than addressing other evidence in the record relating to treatment or findings by medical providers who – like Dr. Vu -- treated T.L. for his back pain, the ALJ cites a cherry-picked list of medical findings by providers who treated him for his heart condition. The ALJ fails to explain why the opinions of these providers are more persuasive than the opinions of Dr. Vu, who is a specialist in physical medicine and rehabilitation. Indeed, the findings the ALJ cites appear to be entirely irrelevant to Dr. Vu's opinions. How, for example, does a September 2019 ECG finding of "normal sinus rhythm with no acute changes" conflict with any opinion of Dr. Vu or have any bearing on the persuasiveness of Dr. Vu's opinions? *See* AR 21.

This error is compounded by the fact that the ALJ fails to meaningfully address the opinions of other providers who examined or treated T.L.'s back pain, including T.L.'s prior treating physician, Dr. Ledean, and consultative examiner Dr. Benrazavi. Dr. Ledean treated T.L.

in 2016 and opined that T.L. "was limited to lifting and carrying 15 pounds occasionally; can stand and walk for 45 minutes per hour, and no bending or twisting, partial to zero postural activities." AR 21. The ALJ found this opinion "partially persuasive" for the identical reason she discounted Dr. Vu's opinion in its entirety, stating, "The medical opinion is not supported by the examination of the claimant, references to specific findings, and well-supported explanations." AR 21. She went on to list the same examples, verbatim, that she provided in support of discrediting Dr. Vu. As discussed above, these examples do not relate to T.L.'s back pain and it is not even clear why they are inconsistent with Dr. Ledean's opinion.

The ALJ cut and pasted the identical reasoning in support of her finding that the opinions of Dr. Benrazavi were only partially persuasive. AR 21. Dr. Benrazavi conducted an internal medicine evaluation and addressed both T.L.'s "history of heart attacks" and his back pain. AR 574-577. Among other things, Dr. Benrazavi examined T.L.'s lumbar spine and made specific findings; he also reviewed T.L.'s MRI. The ALJ's list of findings related to T.L.'s heart condition provide no support for her determination that this examiner's opinions are only partially persuasive, at least as to Dr. Benrazavi's opinions that relate to T.L.'s back pain.

Finally, the ALJ erred in relying on T.L.'s daily activities to discredit Dr. Vu's opinions for the same reasons she erred in rejecting T.L.'s testimony about the severity of his symptoms, discussed below.

In sum, the ALJ failed to provide reasons consistent with the rules set forth above for her evaluation of Dr. Vu's opinions and her determination that Dr. Vu's opinions are not persuasive is not supported by substantial evidence.

### 1. Whether the ALJ Erred in Rejecting T.L.'s Symptom Testimony

#### a. Background

At the hearing on February 23, 2021, T.L. testified that his back pain prevents him from carrying heavy items, twisting and bending his back. AR 43. He testified that if he attempts these activities, it "hurt[s] really bad" and he will be unable to do anything for the whole week." AR 43. According to T.L., when that occurs, he rests, takes medication and uses the TENS machine to address the pain. AR 45. He testified that he can lift only 15 to 20 pounds and he can stand only

for about 25 to 30 minutes at a time. AR 45.

In addition to T.L.'s back pain, he testified that his chest hurt as a result of suffering two heart attacks, the first in 2019, the second after seeing a "really bad" accident while driving. AR 46. T.L. testified that he takes three types of medication for his heart including nitroglycerin, and that while the medication does not make him sleepy or tired, it sometimes makes his heart beat faster and make him nervous. AR 46, 47, 50. T.L. testified that when his heart beats faster T.L. needs to rest and that he has returned to Kaiser a number of times because of his heart rate. AR 47.

Regarding his daily activities, T.L testified that he wakes up each morning, takes his "heart medicine and the medicine for the nerves," and then does a little exercise before brushing his teeth. AR 47. At the time of the hearing, T.L. drove his daughter to school at 8:30 a.m. three times a week, and dropped off his wife at work at 9 a.m., which T.L. testified was about five minutes away from home. AR 47. T.L. picked up his daughter at 3:30 p.m. on the days she went to school, and then at 6 p.m. he picked up his wife. AR at 48. He reported that after he dropped his family off, he returned home to "do a little bit more exercise and relax." AR 47.

Regarding T.L.'s exercise routine, T.L. testified that when he takes a walk he can walk about 15 minutes and then he needs to sit down and take a break. AR 45. Describing his daily routine with respect to taking walks, he testified, "Every day I take a walk . . . around the building. Take a walk 15 minute and sit down and 15 minute again and come home, less than one hour every day. If I don't do it, the back, a lot of pain." AR 45. The ALJ also questioned T.L. about swimming. She observed that "the "record mentioned swimming" and asked, "Before the pandemic were you doing a lot of swimming.?" AR 49. T.L. answered, "Yes. Can you – I don't understand." AR 49. The ALJ responded, "So, the record mentions you would go swimming three to four times a week. Did you used to go swimming before the pandemic?" AR 49. T.L. responded, "I not swim. Swim? No. I go in the YMCA. I work in the water for, to help my lower back. But I not swim." He went on to testify that he went to the YMCA because the doctor from Kaiser had sent him "to the YMCA to help [his] heart." AR 49. He said the pool was closed during COVID but at the time of the hearing, he had resumed going to the YMCA to do his pool

14

1  exercises. AR at 49.

2    T.L. testified that some days he needs to stop what he is doing to rest two to three times

3  because of his heart rate, while other days he can go about his normal activities without stopping

4  to rest. AR 47. T.L. testified that if he does need to stop and rest, he lies down for about half an

5  hour and drinks some water. AR 47. If the increased heart rate returns, he stops again and sits

6  down to relax. AR 47. T.L. testified that on a bad day, he "can do nothing" and must relax. AR

7  48. T.L. also reported pain in his left hand sometimes, but not at the time of the hearing because

8  T.L.'s days consisted of mostly nothing that would aggravate his hands or wrists. AR 48. He

9  reported no trouble reaching forward. AR 48.

10   Finally, T.L. testified that he traveled to Vietnam in 2017 but that the plane trip had been a

11 "real big problem" due to his inability to sit still for long periods of time. AR 53. He had to take

12 his medication and "walk around a lot . . . to help [his] lower back" during the flight. AR 53.

13   In her decision, the ALJ found that T.L.'s daily activities were "inconsistent with the

14 claimant's statements about the intensity and persistence of symptoms." AR 17. She supported

15 this conclusion with the following reasoning:

> The claimant's daily activities included walking three to four blocks on a daily basis on July 2019 [AR 359]. On August 2019, the claimant reported he goes on walks three times per day for 45 to 60 minutes [AR 345]. The claimant reported that he will try swimming [AR 338]. On August 2019, the claimant reported that he walks three to four times per week and started swimming on August 29, 2019 at the YMCA with no chest pain [AR 338]. On October 2019, the claimant reported swimming 3 to 4 times per week and walking daily, with only a little chest pain sometimes [AR 309]. Further, the claimant's treatment record indicated that he traveled to Vietnam for five weeks for tourism, visiting family and friends, swimming, and staying at friend's home and hotels [AR 434–435]. These daily activities are specifically inconsistent with the claimant's subjective complaints about low back pain and chest pains limiting the claimant's ability to perform physical activities.

25 AR 17.

b. Legal Standards

In assessing a claimant's subjective testimony, an ALJ conducts a two-step analysis. *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). The ALJ must first determine "whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (cleaned up). If the claimant does so, and there is no affirmative evidence of malingering, then the ALJ can reject the claimant's testimony as to the severity of the symptoms "only by offering specific, clear and convincing reasons for doing so." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (cleaned up). "These findings, properly supported by the record, must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Bunnell v. Sullivan*, 947 F.2d 341, 345–346 (9th Cir. 1991) (en banc). "General findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (cleaned up).

An ALJ may consider the daily activities of a claimant when weighing the claimant's subjective testimony. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "If the claimant runs marathons, as an extreme example, an ALJ could reasonably assume that the claimant's pain is not so debilitating as to prevent him from working." *Id*. On the other hand, if a claimant "engages in numerous daily activities involving skills that could be transferred to the workplace, the ALJ may discredit the claimant's allegations upon making specific findings relating to those activities." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). However, a claimant need not "vegetate in a dark room" in order to be eligible for benefits. *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987).

### c. Discussion

The ALJ found that T.L. met the first requirement of the two-step analysis discussed above because his medically determinable impairments "could reasonably be expected to cause the alleged symptoms." AR 17. Therefore, she had to offer specific, clear, and convincing reasons for declining to fully credit T.L.'s testimony about the severity of his symptoms. The ALJ did not do so. Nor are the reasons she did cite supported by substantial evidence.

The ALJ relied on T.L.'s walking, "swimming" and a trip to Vietnam before his two heart attacks to discredit his symptom testimony. The most glaring shortcoming in her analysis is her failure to address T.L.'s specific testimony, discussed above, that these activities were performed at the recommendation of T.L's doctors and were for the purpose of reducing his pain and/or addressing his heart issues. Indeed, the record is replete with notes from treatment providers recommending that T.L. include such exercise in his daily routine. Among other things, the record reflects that in March of 2019 T.L attended a 90-minute "back class" where he was given "guidelines for exercise." AR 407. A handout from Kaiser's Back Clinic that was given to T.L. specifically recommends walking and aquatic exercises. AR 567-568. In particular, it states:

> Regular aerobic exercise is necessary to help you recover and to prevent reinjury.
>
> • Your goal is to exercise 5 days weekly, and work up to 30-60 minutes daily.
>
> • If this is not your habit, start with something simple like walking. Begin with 10 minutes, 3 times daily. Gradually increase the intensity and length of your walks.
>
> • **Please note: you should not have increased symptoms when you exercise**. If you do, you must modify what you are doing and consult with your Physical Therapist.
>
> • If walking hurts, doing aquatic exercise is a great alternative, because your spine is unloaded in the water. Even if you are not a swimmer, walking in the water is very therapeutic. Start with 10-15 minutes.

AR 568; *see also* AR 356 (7/23/19 treatment note reflecting that "exercise guidelines" were reviewed); 378 (7/6/19 treatment note stating "Patient able to return home with independent exercise program. PLAN: Discharge PT. Continue with independent walking program as

instructed."); 425 (7/3/18 wellness coaching treatment note including exercise and "tak[ing] a walk" as strategies to help T.L. quit smoking).

Nor does the ALJ address the specific testimony T.L. offered about how he performs these activities. In particular, she does not offer any explanation for finding T.L.'s walking and pool exercises to be inconsistent with his symptom testimony in the face of his testimony that he takes breaks every 15 minutes when he takes walks and that his exercise in the pool do *not* include swimming. She also fails to acknowledge the distinction between "swimming" and other types of exercise in the pool that had been recommended by T.L.'s doctors (e.g. "aquatic exercise" and "walking in the water"), a distinction that also was not clarified at the hearing. (In fact, T.L. himself seemed to be unsure of what the ALJ meant by "swimming", answering first "yes" then "no" to her questions on that subject.)

Finally, the ALJ's reliance on T.L.'s 2017 trip to Vietnam does not constitute a specific, clear and convincing reason for discounting his symptom testimony. First, that trip sheds no light on his symptoms related to his heart condition, including chest pain and elevated heartbeat, because the trip was before T.L.'s 2019 heart attack. As to his back pain, the ALJ does not address or offer any reason for discounting T.L.'s testimony that the plane trip was very difficult for him. In fact, the only evidence the ALJ cites in connection with this trip is a treatment note from *before* the trip describing the planned "trip activity" as: "Tourism, Visit family/ relatives/ friends and swim will stay at family's/ friend's home and hotels." AR 435. The ALJ does not explain why visiting family and friends is inconsistent with T.L.'s symptom testimony or why T.L.'s statement that he planned to "swim" during his trip rendered his testimony not credible.

In sum, the reasons offered by the ALJ for discounting T.L.'s symptom testimony were not supported by specific, clear and convincing reasons or substantial evidence.

### C. Whether the ALJ's RFC Is Supported By Substantial Evidence

A claimant's RFC is "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record," which includes "medical records, lay evidence, and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins v.*

*SSA*, 466 F.3d 880, 883 (9th Cir. 2006) (cleaned up); 20 C.F.R. § 416.945(a)(1) & (3). The ALJ considers limitations supported by the record and need not take into account properly rejected evidence or subjective complaints. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005); *and Batson v. Comm'r of the SSA*, 359 F.3d 1190, 1197 (9th Cir. 2004).

As discussed above, the Court concludes that the ALJ erred in partially discounting Dr. Vu's medical opinion and rejecting T.L.'s symptoms testimony and that her reasons for doing so are not supported by substantial evidence. Consequently, the Court finds that T.L.'s RFC is not supported by substantial evidence and the Commissioner's decision must be reversed.[6]

## VI. REMEDY

"A district court may affirm, modify, or reverse a decision by the Commissioner with or without remanding the cause for a rehearing." *Garrison v. Colvin*, 759 F.3d 990, 1019 (9th Cir. 2014) (cleaned up) (emphasis omitted). "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). On the other hand, the court may remand for award of benefits under the "credit as true" rule where: (1) "the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion"; (2) "there are [no] outstanding issues that must be resolved before a disability determination can be made" and "further administrative proceedings would [not] be useful"; and (3) "on the record taken as a whole, there is no doubt as to disability." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (cleaned up); *see also Garrison*, 759 F.3d at 1021 (holding that a district court abused its

---

[6] The Court need not reach the question of whether the ALJ properly took into account T.L.'s age category at the time of the hearing in performing her step five analysis as the Commissioner will be required to revisit this question on remand. Likewise, the Commissioner will be required to consider all of T.L.'s impairments in determining his RFC. *See Frary v. Comm'r of Soc. Sec.*, No. 1:20-CV-00260-SAB, 2021 WL 5401495, at *7 (E.D. Cal. Nov. 18, 2021) ("The ALJ must consider both severe and nonsevere medically determinable impairments when determining the RFC"). Thus, the Commissioner will be required to consider any limitations associated with T.L.'s headaches and cervical radiculopathy in determining T.L.'s new RFC. Therefore the Court does not reach the question of whether the ALJ erred by failing to include in T.L.'s RFC any limitations associated with these impairments.

discretion in declining to apply the "credit as true" rule to an appropriate case).

It is not clear from the record here that the ALJ would be required to find T.L. disabled if all of the evidence were properly evaluated. In particular, although Dr. Vu found T.L.'s limitations to be more significant than the limitations in the ALJ's RFC, she completed the form after having only treated T.L. for less than a month and at that time her prognosis for him was "good." Therefore, the Court concludes that remand for further proceedings consistent with this opinion is appropriate.

## VII. CONCLUSION

For the reasons discussed above, T.L.'s motion for summary judgment is GRANTED, the Commissioner's motion for summary judgment is DENIED, and this matter is remanded for further proceedings. The Clerk shall enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

Dated: September 13, 2023

_____
JOSEPH C. SPERO
Chief Magistrate Judge